DeBRUCE GRAIN, INC., Plaintiff,

v.

UNION PACIFIC RAILROAD CO., Defendant.

No. 97–1413–CV–W–3.

United States District Court,
W.D. Missouri,
Western Division.

Oct. 30, 1997.

Mark S. Foster, Stinson, Mag & Fizzell, P.C., Kansas City, MO, for Plaintiff.

## 1281

*ORDER DENYING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND DISMISSING CASE WITHOUT PREJUDICE*

SMITH, District Judge.

Pending is Plaintiff's Motion for a Temporary Restraining Order, intended to (in the words of Plaintiff's proposed Order) restrain Defendant "from continuing to breach its statutory and contractual obligations to supply rail cars" to Plaintiff's grain elevators and "to immediately commence and continue delivery of rail cars ti those facilities" in accordance with a particular tariff. For the following reasons, the Motion (Doc. #4) is denied, and the case is dismissed without prejudice to Plaintiff's right to seek recourse before the Surface Transportation Board ("STB" or "the Board").

### I. BACKGROUND

Plaintiff is in the business of merchandising grain, and three of its grain elevators are located in Nebraska City, Lexington, and Fremont, Nebraska. These elevators are, for the most part, dependant upon rail transportation for outbound service, and Plaintiff relies upon Defendant to provide the necessary rail service. For its part, Defendant provides grain cars under three programs, each of which is set forth in UP Tariff ICC UP 4051 (the "Tariff"). Section 1 of the Tariff provides that shippers may order rail cars upon seven to fourteen days notice. Shippers are not obligated to order cars, and "[c]ar placements will be made when cars are available, not on a guaranteed basis; therefore, no penalties will be applicable to Union Pacific for late delivery." Section 2 of the Tariff describes the Guarantee Freight Pool program ("GFP"). Under the GFP, shippers can sublease their own cars to Defendant, and "shippers will be guaranteed monthly car placements equal to 1.4 times the number of cars" that are subleased by the shipper. Shippers are then required to divide the cars guaranteed to them into two roughly equal portions, with one portion to be delivered by Defendant in the first half of the month and the second portion to be delivered in the second half of the month. Section 2 goes on

to further describe its "guarantee" provisions:

> Union Pacific will guarantee to furnish covered hoppers during the applicable shipping half-month period for all orders placed within the times specified above, and in the event of late delivery, Shippers may cancel the orders and claim a cancellation penalty of $250 per car from the Railroad, or will be given one of the following options (at Railroad's discretion):
>
>   1) Roll the car order into the following shipping half-month period on a guaranteed basis.
>   2) Waive the $250 penalty and roll the car order forward for delivery of cars at a future date.

Section 2 also contains provisions in the event that the Shipper fails to load the required number of cars.

Section 3 is a voucher system. Under Section 3, Defendant is permitted to offer vouchers that guarantee placement of a specified number of grain cars in a specified shipping period (i.e., the first half or second half of a given month). Upon "Union Pacific's failure to place the guaranteed Voucher equipment within the applicable shipment period" it must pay the voucher's holder a penalty of $50 per car per day, up to a maximum of $400 per car. In addition, Section 3 specifies that the voucher holder's entitlement to placement remains in existence until it is honored. There is a secondary market for vouchers; when demand for cars exceeds their availability, a voucher's value increases.

In July and August of 1997, Defendant sold vouchers guaranteeing delivery of grain cars in September and October. However, by the time September and October arrived, Defendant encountered a shortage of grain cars and congestion on railways that inhibited its ability to move them where they

needed to be. Defendant made what it believed to be a sound business decision: it honored its obligations to provide guaranteed cars to voucher holders and delayed delivery to those due grain cars under the GFP. The economic soundness of this decision was based on the penalties for nonperformance under the two programs: the monetary sanction under the GFP is less than the sanction for failing to honor a voucher. In addition, if a shipper cancels an order under the GFP, Defendant's obligation to provide a car to that shipper would be eliminated; however, if a voucher was not honored, the obligation to provide a car to its holder would continue indefinitely. Consequently, Defendant advised Plaintiff that its GFP orders would be filled late unless they were canceled.[1]

Plaintiff has filed suit, alleging a claim for (1) breach of contract and (2) breach of statutory obligations. The former claim is premised on Plaintiff's contention Defendant has violated its obligations under the Tariff, and the latter claim is premised on Defendant's failure to provide rail service as required by 49 U.S.C. §§ 11101(a) and 11121(a)(1). Plaintiff has requested a temporary restraining order that requires Defendant to supply it with grain cars,[2] monetary damages and recovery of its attorney fees and costs. In addition to contesting Plaintiff's satisfaction of the requirements for obtaining a TRO, Defendant contests this Court's jurisdiction in the matter.

## II. DISCUSSION

### A. Subject Matter Jurisdiction/Primary Jurisdiction

Before addressing the issues related to issuing a TRO, the Court will address Defendant's companion arguments related to jurisdiction. Defendant contends (1) that the Court lacks jurisdiction to issue injunctive

---

1. Plaintiff's suggestion that Defendant preferred filling vouchers over GFP orders because it can achieve greater revenue under the voucher program is not well taken. Although the scarcity of grain cars increased the value of vouchers, the increased value inured to the holder's benefit, not to the issuer's benefit.

2. The precise nature of the requested injunctive relief has been somewhat unclear. In the opening paragraph of this Order, the Court quoted

language that appears in Plaintiff's proposed temporary restraining order. In its Amended Complaint, Plaintiff asks that Defendant be enjoined from violating its statutory obligations and directed "to exercise every reasonable effort to supply cars to satisfy DeBruce's car orders...." At the hearing, Plaintiff suggested that Defendant be ordered to provide cars on a pro rata basis between orders placed via the GFP and those placed by voucher holders.

relief, and (2) in any event, the doctrine of primary jurisdiction suggests that the Court should not entertain this case and let the parties proceed before the STB.

## 1. Subject Matter Jurisdiction of District Courts

In 1995, Congress passed the ICC Termination Act ("ICCTA"), which furthered the deregulation of the rail and motor carrier industries, abolished the Interstate Commerce Commission, and bestowed certain enforcement and regulatory authority upon the STB. *See City of Laredo v. Texas Mexican Ry. Co.*, 935 F.Supp. 895, 897 (S.D.Tex.1996) (citing H.R. Rep. No. 311, 104th Cong., 1st Sess. 82–83 (1995), *reprinted in* 1995 U.S.C.C.A.N. 793–94). 49 U.S.C. § 11101(a) requires carriers to "provide ... transportation or service on reasonable request," and section 11121(a)(1) contains a similar requirement. Plaintiff contends that 49 U.S.C. § 11704 bestows this Court with jurisdiction to entertain this lawsuit and provide the relief it seeks. The first sentence in Section 11704(b) provides that a rail carrier "is liable for damages sustained by a person as a result of an act or omission of that carrier in violation of this part"[3] and the second sentence provides that a rail carrier "is liable to a person for amounts charged that exceed the applicable rate for the transportation." Section 11704(c)(1) provides that "[a] person may file a complaint with the Board under section 11701(b) of this title or bring a civil action under subsection (b) of this section to enforce liability against a rail carrier...." From these provisions, Plaintiff reaches the conclusion that it may file a civil action for monetary damages caused by Defendant's purported violations of sections 11101(a) and 11121(a)(1). The Court disagrees.

First, and perhaps most importantly, the Board has exclusive jurisdiction over "transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including *car service*, interchange, and other operating rules), *practices*, routes, *services*, and facilities of such carriers." 49 U.S.C. § 10501(b)(1) (emphasis supplied). The breadth of this provi-

sion, along with the highlighted terms, bestows exclusive authority upon the Board to impose remedies associated with a carrier's service, which would include a carrier's obligations under sections 11101(a) and 11121(a)(1). In previous instances in which the seemingly broad grant of judicial jurisdiction contained in § 11704(b) (formerly § 1705(b)(2)) collided with a provision vesting exclusive jurisdiction in the Board (or its predecessor, the ICC), the exclusivity of the administrative agency's jurisdiction prevailed over the broad grant of authority to the courts. *E.g., Kraus v. Santa Fe Southern Pacific Corp.*, 878 F.2d 1193, 1197–98 (9th Cir.1989), *cert. dismissed*, 493 U.S. 1051, 110 S.Ct. 1329, 107 L.Ed.2d 850 (1990) (ICC's exclusive jurisdiction to assess mergers prevents private suit in federal court under § 1705(b)(2) for damages caused by the merger).

Plaintiff places high emphasis on the following sentence from section 10501(b): "Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." Plaintiff reasons that, because section 11704(b) is "provided under this part," it is free to seek redress in federal court. The first problem with this view is that if it is correct, then there will be nothing left of the Board's exclusive jurisdiction. Second, this sentence addresses appropriate remedies, and establishes that other laws—state or federal—may not be employed; it does not purport to allocate adjudicative authority between the Board and the Courts like the preceding passages do. Finally, this provision does not purport to interpret section 11704.

The Court's conclusion is buttressed by the structure of section 11704 and the surrounding statutes. For instance, section 11705 is a statute of limitations applicable to section 11704. Subsection (a) provides the limitation period for "civil actions" brought by carriers seeking charges for transportation, subsection (b) applies when someone brings a "civil

---

**3.** The reference to "this part" refers to Part A of Title 49 of the United States Code, which applies to rail carriers.

action" to recover overcharges, and subsection (e) applies when someone brings a "civil action" to enforce an order from the Board requiring a carrier to pay money. In contrast, subsection (c) declares that "[a] person must file a complaint with the Board to recover damages under section 11704(b) of this title within 2 years after the claim accrues." The interplay of these subsections is significant: there is no provision governing the filing of a "civil action" for damages other than with respect to the right to recoup overcharges or to enforce the Board's orders. The lack of a limitation period for the type of suit brought by Plaintiff is conspicuous and suggests when Congress permitted "civil actions" under section 11704(b) (as provided in section 11704(c)), it meant to do so only with respect to an action to recover overcharges. To interpret section 11704(b) as broadly as Plaintiff suggests would leave Plaintiffs with no limitation period, which is an absurd result that Congress could not have intended. As one court recently observed, "a person may file suit in federal court only to enforce an order of the Board, to recover overcharges or to recover under a bill of lading." *City of Laredo*, 935 F.Supp. at 898. History supports this statement: despite the presence of similar statutory language prior to the ICCTA's enactment, no Court has ever entertained a suit premised solely on alleged violations of broad, transportation policy statements.

For these reasons, the Court concludes that the Board has exclusive jurisdiction to consider Plaintiff's claims that Defendant failed to satisfy its obligations under sections 11101(a) and 11121(a)(1).

### 2. Primary Jurisdiction

■ Even if the Court had jurisdiction, it would apply the doctrine of primary jurisdiction and dismiss the case. Primary jurisdiction "is a common law doctrine used to coordinate administrative and judicial decisionmaking." *Red Lake Band of Chippewa Indians v. Barlow*, 846 F.2d 474, 476 (8th Cir.1988); *see generally United States v. Western Pacific R. Co.*, 352 U.S. 59, 64–66, 77 S.Ct. 161, 165–66, 1 L.Ed.2d 126 (1956). There is no fixed formula for determining when the doctrine applies; "the question is whether the reasons for the existence of the doctrine are present and whether the pur-

poses it serves will be aided by its application in the particular litigation." *Western Pacific*, 352 U.S. at 64, 77 S.Ct. at 165. The doctrine applies when the claims presented "contain some issue within the special competence of an administrative agency," *Reiter v. Cooper*, 507 U.S. 258, 268, 113 S.Ct. 1213, 1220, 122 L.Ed.2d 604 (1993), that are not within the province or understanding of the judiciary and when uniformity of decisionmaking takes on special importance. *Western Pacific*, 352 U.S. at 64–65, 77 S.Ct. at 165–66.

The national importance of interstate transportation cannot be doubted. Indeed, Congress has set forth an impressive list of important and often contradictory goals it hopes to achieve through its regulatory efforts of railroads. 49 U.S.C. § 10101. Congress has established a variety of bodies (of which the Board is but one) to control, guide, oversee and steer the industry toward these ends. It should come as no surprise, then, that a federal courts have frequently, if not routinely, refrained from answering questions related to the provision of interstate transportation services and interpretation of tariffs. *E.g., Western Pacific*, 352 U.S. at 64–65, 77 S.Ct. at 165–66; *Milne Truck Lines, Inc. v. Makita U.S.A., Inc.*, 970 F.2d 564, 567–68 (9th Cir.1992); *Elgin Coal Co. v. Louisville & Nashville R. Co.*, 411 F.2d 1043, 1045 (6th Cir.1969); *Spence v. Baltimore & Ohio R. Co.*, 360 F.2d 887, 890–91 (7th Cir.), *cert. denied*, 385 U.S. 946, 87 S.Ct. 318, 17 L.Ed.2d 225 (1966); *Bartlett & Co. Grain v. Union Pacific R. Co.* 528 F.Supp. 1234, 1239–40 (W.D.Mo.1981) (J. Gibson, District Judge).

■ Plaintiff contends the doctrine of primary jurisdiction should not apply for two reasons. First, Plaintiff contends that the doctrine does not apply when Congress specifically provides for judicial resolution of a matter. The Eighth Circuit has held that "[i]t is inappropriate to invoke the doctrine of primary jurisdiction in a case in which Congress, by statute, has decided that the courts should consider the issue in the first instance." *United States v. McDonnell Douglas Corp.*, 751 F.2d 220, 224 (8th Cir.1984). Setting aside the Court's doubts about its jurisdiction in this matter, the problem with

overemphasis on this passage is that primary jurisdiction can be invoked only if the courts have concurrent jurisdiction with an administrative agency. *E.g., Reiter,* 507 U.S. at 268, 113 S.Ct. at 1220 (primary jurisdiction "is a doctrine specifically applicable to claims properly cognizable in court"); *Red Lake Band of Chippewa Indians,* 846 F.2d at 476 (primary jurisdiction applies "when a court and an agency have concurrent jurisdiction to decide a question" (quotation omitted)). Even if this Court has jurisdiction, there can be no doubt that it is concurrent with the Board's jurisdiction. This feature distinguishes *McDonnell Douglas,* for in that case Congress instructed courts, and no other body, to enforce subpoenas issued by the Comptroller General. 751 F.2d at 224.

■ Plaintiff also contends that primary jurisdiction should not be invoked with respect to its breach of contract claim because the Board's expertise is not required to interpret the Tariff. In Plaintiff's view the issue at hand is extremely narrow: Section 2 declares that "Union Pacific will guarantee to furnish covered hoppers during the appropriate half-month...." The problem is that nearly identical language appears in Section 3, which states that "Union Pacific guarantees to deliver the agreed number of covered hopper cars...." The real issue is: when there aren't enough covered hopper cars to satisfy all the guaranties Defendant made, what is Defendant obligated to do? As the parties arguments and Plaintiff's suggestions regarding relief demonstrate, there are a myriad of ways to resolve this issue—and all of the alternatives have significant impact on the nation's rail policy. "Broadly speaking, the doctrine of primary jurisdiction requires that disputes regarding tariff construction be referred to the [Board] if interpretation of the disputed term or phrase implicates larger issues of transportation policy that demand uniform administration by an expert body." *Milne Truck Lines,* 970 F.2d at 567; *see also Bartlett,* 528 F.Supp. at 1243 ("The questions concerning tariff construction are intertwined with the reasonableness of the practice of refusing switching service.... These further considerations compel the conclusion that primary jurisdiction is in the [Board]"). If, as suggested, Defendant's obligation in this situation is to act "reasonably," the issue

is still best decided by the Board and not the courts. *E.g., Elgin Coal,* 411 F.2d at 1045 (agreeing with "the District Court that this doctrine generally requires that the [Board] make the initial determination whether rail service is reasonable"); *Spence,* 360 F.2d at 891 (reversing District Court's order requiring railroad to supply plaintiff with a specified number of cars); *Bartlett,* 528 F.Supp. at 1240 ("In the present case ... the adequacy of the service being rendered and its reasonableness are in issue. Primary jurisdiction applies where, as here, the issues involve relevant considerations which the court cannot properly evaluate.").

For these reasons, the Court concludes that even if it has jurisdiction in this case, the doctrine of primary jurisdiction applies and prevents the Court from resolving the Plaintiff's claims at this time.

### B. Temporary Restraining Orders

■ Assuming that this Court has jurisdiction and that the doctrine of primary jurisdiction does not apply, issuance of a temporary restraining order would be inappropriate. The familiar standard that governs Plaintiff's request requires consideration of "(1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Systems, Inc. v. C L Systems, Inc.,* 640 F.2d 109, 114 (8th. Cir. 1981) (en banc.). The Court has serious reservations about all four elements.

The Court is persuaded that Plaintiff will suffer harm if Defendant continues to prefer voucher orders over GFP orders; the Court is not persuaded that the harm is irreparable. Plaintiff can (and, to some extent, has) purchased vouchers to obtain rail service. Rail service is available from other providers; although this service may be more costly, the difference in price between this "cover" and rail service from Defendant constitute monetary damages. Finally, Plaintiff is entitled to damages under the Tariff if it cancels its orders. Ultimately, Plaintiff has not demonstrated that its remedies at law are deficient.

·As stated, Plaintiff is harmed by the unavailability of rail cars. However, granting an injunction will potentially subject Defendant to a flood of similar suits from others whose rights are governed by the Tariff. This is not meant to imply that the Court is motivated to protect Defendant from liability for its past actions; however, the Court should not order relief that requires Defendant to take actions that will expose it to further liability. Along these same lines, there is no way to insure that the public interest will be served by any order that requires Defendant to prefer Plaintiff over other shippers. In fact, although it is not specifically identified as a factor in *Dataphase,* the Court is concerned that it does not know what it should order Defendant to do or not do. The Court cannot order Defendant to honor all orders; this is a physical impossibility. There is no rational basis for ordering Defendant to honor Plaintiff's orders over all other orders, or even to honor GFP orders over voucher orders. Similarly, there is no contractual requirement that all orders placed be treated on a pro rata basis, and the Court lacks the expertise to determine that this order would be reasonable in light of the national rail policy (which inquiry informs the public policy consideration required before issuing injunctive relief).

Finally, although there is no doubt that Defendant has failed to honor Plaintiff's orders, the Tariff provides for damages in this situation. It is not at all clear that Plaintiff can rely on the Tariff as grounds for further relief, so there is some doubt as to whether Plaintiff will truly prevail on the merits. Plaintiff may have a claim based on sections 11101(a) and 11121(a)(1), but there is insufficient evidence to permit the Court to conclude that Plaintiff is likely to prevail on its claim that Defendant has acted unreasonably.

**4.** For the record, Plaintiff's Reply to Suggestions in Opposition, filed on the afternoon of October 29, 1997, were received in time to be—and were—considered by the Court.

**5.** As the *Reiter* Court noted, the term "referral" is a misnomer as applied in this context because there is no statutory mechanism for referring cases to the Board. In this context, the Court's alternative to dismissal is to stay proceedings

### C. Dismissal

█ The parties have discussed the issues of jurisdiction and primary jurisdiction at length.[4] As stated, the Court is persuaded that it lacks jurisdiction over Plaintiff's statutory claims, so these claims must be dismissed. The Court is also persuaded that the doctrine of primary jurisdiction precludes consideration of Plaintiff's contract claims. Here, the Court has a choice. "Referral of the issue to the administrative agency does not deprive the court of jurisdiction; it has discretion either to retain jurisdiction or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice." *Reiter,* 507 U.S. at 268–69, 113 S.Ct. at 1220.[5] This case has not had a lengthy history in the courts, and relatively few resources have been expended in this forum. Moreover, there is no risk that Plaintiff's claims will be barred by any applicable statute of limitations. Finally, the statutory claims and the contract claims are interrelated and, to a large extent, involve identical issues and considerations. Consequently, the Court deems it best to dismiss the case without prejudice.[6]

### III. CONCLUSION

Plaintiff's Motion for a Temporary Restraining Order (Doc. # 4) is denied, and this case is dismissed without prejudice to Plaintiff's right to seek relief from the Surface Transportation Board.

IT IS SO ORDERED.

and permit the Plaintiff an opportunity to seek relief from the Board. *Reiter,* 507 U.S. at 268 n. 3, 113 S.Ct. at 1220.

**6.** In light of the Court's holding, there is no need to address Defendant's argument that the Court cannot award injunctive relief because section 11704(b) says that a carrier "is liable for damages" but does not specifically say that courts can award injunctive relief.